William A. Kershaw, State Bar No. 057486
Stuart C. Talley, State Bar No. 180374
Ian J. Barlow, State Bar No. 262213
**KERSHAW TALLEY BARLOW PC**
401 Watt Avenue
Sacramento, California 95864
Telephone: (916) 779-7000
Facsimile: (916) 244-4829
Email: bill@ktblegal.com
Email: stuart@ktblegal.com
Email: ian@ktblegal.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

ADAM CAPLAN, as an individual and on behalf of all others similarly situated,

Plaintiff,

v.

SPRUCE POWER 1, LLC, a Delaware limited liability company; SOLAR SERVICE EXPERTS LLC, a Delaware limited liability company; and DOES 1 through 50, inclusive,

Defendants.

Case No. 5:25-cv-09725-EKL

**FIRST AMENDED CLASS ACTION COMPLAINT**

1. Violation of California's Unfair Competition Law;
2. Breach of Contract;
3. Negligence;
4. An Accounting

**JURY TRIAL DEMANDED**

## INTRODUCTION

1. Plaintiff Adam Caplan ("Plaintiff") brings this proposed class action on behalf of himself and all current and former individuals and entities in California whose Solar Energy Purchase Agreements were administered by Defendants, SPRUCE POWER 1, LLC and SOLAR SERVICE EXPERTS LLC (collectively "Defendants" or "Spruce")

2. Spruce is an entity that provides solar energy and related services to more than 85,000 customers throughout the United States through what are known as Power Purchase Agreements ("PPAs").

3. In a typical PPA, a consumer will enter into a contract with a solar energy provider to have solar panels installed on their home. The energy provider maintains ownership of the panels and the consumer agrees to purchase all of the electricity generated by the panels for a set price. Typical agreements require the consumer to make a fixed monthly payment for the electricity based on an estimate of the total amount of electricity the consumer is expected to use. If, at the end of the year, the consumer used less electricity than what was estimated, the solar energy provider issues a payment or credit to the consumer to account for the difference between the amount paid for the electricity and the amount that was actually used. This is known in the industry as a "True-Up" payment.

4. Additionally, a typical PPA will include what is called a "performance guarantee." A performance guarantee is a guarantee that the solar panels will generate a certain amount of electricity each year. If, at the end of the year, the panels did not generate a sufficient amount of electricity, thus requiring the consumer to purchase electricity from his/her utility, the solar energy provider is required to make up the shortfall. This is called a "Performance Guarantee" payment.

5. Spruce Power 1 and Solar Service Experts are both jointly owned by a parent corporation, Spruce Power Holdings. These entities, which work in concert with each other, are in the business of both administering PPAs for third parties and acquiring PPAs on their own account. When a Spruce entity purchases a PPA, it assumes all of the rights and responsibilities of the original solar energy provider.

6. For most consumers, it is difficult to keep track of the amounts that might be owed from year to year for Performance Guarantee and True-Up payments. As a result, they rely on the solar energy provider to provide an accounting and ensure that the appropriate payments are issued. As alleged below, Spruce engages in business practices that are designed to take advantage of the difficulties consumers face keeping track of these payments.

7. Specifically, instead of issuing timely accountings to customers showing the amount of electricity paid for and whether the solar panels met any performance guarantees, Spruce does nothing. It is only when consumers notice through their own research that a payment is owed and call to complain, that Spruce makes the payments that are owed. And, to make matters worse,

Spruce puts in place enormous barriers to make it difficult for consumers to obtain their payments. Consumers who notice they have not received their annual payment must spend hours on the phone with various call center employees and email inquiries go unreturned. And, even after Spruce acknowledges that payments are owed, it often takes months to issue payments. This is all done with the hope that large numbers of consumers will either not notice that payments are owed under their contract or will simply give up trying to navigate Spruce's unresponsive customer service department.

8. Through this lawsuit, Plaintiff seeks an order enjoining the Defendants' from continuing to engage in this unfair business practice, to provide a full accounting to class members concerning the amounts that are owed for True-Up and Performance Guarantee payments, and to pay the Plaintiff and the Class all amounts that are owed under their PPAs.

## PARTIES

9. Plaintiff Adam Caplan is, and at all relevant times was, a citizen and resident of Cameron Park, California.

10. Defendant SPRUCE POWER 1, LLC is a Delaware limited liability company that owns and/or administers PPAs throughout the United States. Its principal executive offices are located at 820 Gessner Rd, Suite 500, Houston, Texas 77024. SPRUCE POWER 1, LLC is a wholly owned subsidiary of Spruce Energy Holdings.

11. Defendant SOLAR SERVICE EXPERTS LLC is a Delaware corporation that administers PPAs throughout the United States on behalf of SPRUCE POWER 1, LLC and other subsidiaries of Spruce Energy Holdings. Its principal executive offices are located at 820 Gessner Rd, Suite 500, Houston, Texas 77024. SOLAR SERVICE EXPERTS LLC is also a wholly owned subsidiary of Spruce Energy Holdings.

12. Defendants SPRUCE POWER 1, LLC, SOLAR SERVICE EXPERTS, and DOES 1 through 50, are alter egos of each other. There exists, and at all times herein mentioned there existed, a unity of interest and ownership between, by and among Defendants such that any individuality and separateness between these individuals and entities have ceased to exist. Defendants used and continue to use corporate or other entity funds and assets belonging to each

other as if they were the same entities. Defendants failed to adequately capitalize their corporations, instead siphoning off profits and diverting assets from them to wrongfully protect the facility's assets from exposure to liability. Since the profits have been wrongfully transferred, an injustice would occur to injured consumers if all Defendants were not parties to this suit.

13. The true names and capacities of the Defendants named herein as DOES 1 through 50, inclusive, whether individual, corporate, associate, or otherwise, are unknown to Plaintiff, who therefore sues such Defendants by fictitious names pursuant to Code of Civil Procedure section 474. Plaintiff is informed and believes that said DOE defendants are California residents, and Plaintiff will amend this Complaint to show such true names and capacities when they have been determined.

14. At all times mentioned herein, each and every Defendant was the agent and employee of each and every other Defendant; and, in doing the things alleged, was acting within the course and scope of such agency and employment; and, in doing the acts herein alleged, was acting with the consent, permission and authorization of each of the remaining defendants. All actions of each Defendant herein alleged were ratified and approved by the officers or managing agents of every other Defendant.

15. Plaintiff is informed and believes, and thereby alleges, that each of the Defendants herein were at all times relevant hereto the agent, managing agent, employee or representative of the remaining defendants and was acting at least in part within the course and scope of such relationship.

16. Additionally, each of the Defendants named herein aided and abetted the other in connection with the misconduct alleged in herein and each was the joint venturer of the other.

## JURISDICTION AND VENUE

17. This Court has original jurisdiction over the Class Action Fairness Act, 28 U.S.C § 1332(d), because (a) at least one member of the proposed class is a citizen of a state different from Defendants; (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, (c) the proposed class consists of more than 100 class members, and (d) none of the exceptions under the subsection apply to this section.

18. This Court has jurisdiction over Defendants because they have sufficient minimum contacts in California, and otherwise intentionally availed themselves of the markets within California through the purchase of PPAs within the state, such that the exercise of jurisdiction by this Court is proper and necessary.

19. Venue is proper in this District under 28 U.S.C. § 1391 because Defendants conduct substantial business in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred in this District. Specifically, the original contract entered into between Plaintiff and Greenday Finance I, LLC that was eventually acquired by defendants provides that the exclusive jurisdiction for any court action or proceeding arising out of or related to this Agreement shall be the federal or state courts of Santa Clara County, California, which is in the San Jose Division of this District.

## FACTUAL ALLEGATIONS

20. On or about January 6, 2012, Plaintiff entered into a PPA with Greenday Finance I, LLC with a term of 20 years. Under the terms of the Agreement, Greenday paid for and installed solar panels on the Plaintiff's home. Greenday maintained ownership of the panels, and, under the Agreement, Plaintiff agreed to purchase all of the electricity generated by the panels for a set price.

21. For purposes of paying for the electricity, the Agreement identified an estimate of the electricity that Plaintiff was expected to use on an annual basis and the estimated cost of that power. Plaintiff would then be billed on a monthly basis for 1/12 of the estimated power usage. To the extent the amount paid by Plaintiff exceeded the amount of electricity generated from the panels that was used by Plaintiff, the contract provided that Greenday would make a payment each year to account for the overpayment. This is referred to in the contract as a True-Up Payment.

22. Additionally, the Agreement included a "Performance Guarantee." Under the Performance Guarantee, Greenday guaranteed that the panels would generate a certain amount of electricity on an annual basis. If the amount of electricity generated form the panels was less than the average guaranteed output for the year thus requiring Plaintiff to purchase electricity from his utility, Greenday was required to pay the Plaintiff the difference between the guaranteed output and the amount Plaintiff was required to purchase from his utility.

23. Both the Performance Guarantee and True-Up Provisions in Plaintiff's contract are commonly included in residential electricity purchase agreements sold throughout the United States.

24. From 2012 through 2020 Greenday fully complied with the terms of the PPA. At the end of each year, Plaintiff would receive a statement calculating the True-Up and Performance Guarantee payments and, if amounts were owed, he would receive payment or credit for these amounts.

25. On or about February 25, 2020, Plaintiff received an email from Greenday advising him that his Agreement had been purchased by defendant, Spruce Solar, effective March 1, 2020 and that, going forward, the administration of his contract would be performed by Solar Service Experts. However, after Spruce Solar and Solar Service Experts took over the administration of Plaintiff's contract, everything changed.

26. In March 2021 and March 2022 (the anniversary date of Plaintiff's contract), Plaintiff was owed True-Up and Performance Guarantee payments. However, Spruce never provided Plaintiff an accounting and the payments were never issued.

27. It was not until April 2022 that Plaintiff realized he had never received a payment or credit for his True-Up and Performance guarantees for the previous two years. He began reaching out to Defendants to determine why the payments were not issued. This resulted in multiple phone calls, hours on hold, and numerous email inquiries. Although the Defendants acknowledged the payments were owed, it was not until September 2022 that they finally issued Plaintiff a payment. Defendants claimed that non-payment was a problem with their "system" and that the issue would not occur in the future.

28. However, in March 2023 the problem arose again. Even though Plaintiff was owed True-Up and Performance Guarantee payments, none were issued, and no accounting was provided. Again, Plaintiff was forced to make numerous phone calls, send countless emails, and spend hours on hold to get someone to address the issue. It was not until nine months later that Defendants finally issued Plaintiff the payment he was owed under his contract. And, again, they promised to fix their "system" so that the error would not occur in the future.

29. In March 2024, Defendants again failed to issue Plaintiff his true up and performance guarantee payments. At this point, Plaintiff threatened legal action and to terminate his contract with Defendants. Despite these threats it still took defendant until May 2024 to issue payment. And again, Plaintiff was promised that the issue would not occur in the future.

30. In March 2025, Plaintiff discovered that Defendants had failed to issue his True-Up and Performance Guarantee payments. Thereafter, Plaintiff reached out to Defendants at least 14 times by email or phone to obtain an explanation. However, his inquiries were simply ignored, and, to date, Defendants have not issued Plaintiff the True-Up and Performance Guarantee payments owed under his contract. Plaintiff is informed and believes that he is currently owed at least $1,200 in True-Up and Performance Guarantee payments.

31. On several occasions in 2022 and 2023 plaintiff advised defendants that he was terminating his agreement pursuant to Section 14.04(e) of the Agreement which provides that "This Agreement shall terminate upon the occurrence of any one of the following: . . . Either Party is in breach of this Agreement and such breach continues, after notice to the other Party, for a period greater than ninety (90) calendar days." In response, defendants have taken the position that its non-payment of True-Up and Performance Guarantee payments was not a "material breach" and as a result, the election to terminate the agreement was invalid.

## CLASS ACTION ALLEGATIONS

32. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2) and 23(b)(3) against Defendant on behalf of himself and the following Class defined below.

33. Plaintiff brings this class action on behalf of himself and the following proposed Class:

> All persons and entities in California who, at any time from four years prior to the filing of this complaint through the date of final judgment, were purchasers of electricity pursuant to a Power Purchase Agreement that includes performance guarantees and/or true up provisions that were owned and/or administered by Defendants.

34. Additionally, plaintiffs seek to certify a subclass of individuals defined as follows:

> All persons and entities in California who, at any time from four years prior to the filing of this complaint through the date of final judgment, were purchasers

> of electricity pursuant to a Power Purchase Agreement that includes performance guarantees and/or true up provisions that were owned and/or administered by Defendants and who provided notice to Defendants of its breach of the agreement for the non-payment of performance guarantees or true-up payments but did not receive payment within 90 days of providing notice. (the "Declaratory Relief Subclass").

35. Subject to additional information through further investigation and discovery, the foregoing definitions of the Class may be expanded or narrowed by amendment or amended complaint. Specifically excluded from the Class: Defendant, as well as Defendant's employees, officers, directors, and legal representatives; Class Counsel and their employees; and the judicial officers and their immediate family members and associated Court staff assigned to this case.

36. Numerosity: Though the exact number and identity of Class members is not presently known, they can be identified in Defendants' records through coordinated discovery pursuant to this class action. Plaintiff believes that thousands of individuals and entities have their solar energy contracts administered by Defendants.

37. Commonality and Predominance: Common questions of fact and law predominate over any questions affecting only individual members of the Class. The predominating common or class-wide questions of fact include the following:

a. Whether the Defendants intentionally or negligently fail to pay performance guarantee and true up payments.

b. Whether Defendants have a custom and practice of making it difficult for consumers seeking performance guarantee and true up payments to obtain their payments.

c. Whether Defendants have a custom and practice failing to provide accurate and timely accountings to consumers regarding their true up and performance guarantee payments.

d. Whether Defendants breached contracts with class members.

e. Whether Defendants were negligent.

f. Whether Defendants engaged in unfair business practices.

38. Typicality: Plaintiff's claims are typical of the claims of the Class members, as all

Class members were and are similarly affected by defendant's wrongful conduct complained of herein. Plaintiff and each of the Class members were parties to standardized solar energy contracts administered by Defendants.

39. Adequacy: Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class members he seeks to represent. Plaintiff has retained counsel highly experienced in the prosecution of complex class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff and his counsel will fairly and adequately protect the interests of all members of the Class.

40. Superiority: A class action is superior to all other available methods for the fair and efficient adjudication of the rights of each Class member. Joinder of individual Class members is impracticable. Individual litigation would be unnecessarily costly and burdensome and would deter individual claims. To process individual cases would increase both the expenses and the delay not only to Class members, but also to Defendant and the Court. In contrast, a class action in this matter will avoid case management difficulties and provide multiple benefits to the litigating parties, including efficiency, economy of scale, unitary adjudication with consistent results and equal protection of the rights of each class member, all by way of the comprehensive and efficient supervision of the litigation by a single court.

41. This Class may be certified because:

a. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual members of the proposed Class that would establish incompatible standards of conduct for Defendant;

b. The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

c. Defendant has acted or refused to act on grounds generally applicable to the

Class members, thereby making appropriate final and injunctive relief with respect to Class members as a whole.

**<u>FIRST CLAIM FOR RELIEF</u>**

**(Violations of Cal. Bus. & Prof. Code sections 17200, *et seq.*)**

42. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

43. Defendants' practice of intentionally failing to provide consumers with True-Up and Performance Guarantee payments and/or making it difficult for them to obtain such payments constitutes an unfair business practice under the Unfair Competition Law, Business and Professions Code section 17200, *et seq*. ("UCL").

44. Defendants committed unfair business practices by:

a. Engaging in conduct, as alleged herein, where the utility of such conduct, if any, is outweighed by the gravity of the consequences to Plaintiff and other Class members; and

b. Engaging in conduct, as alleged herein, that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiff and the other Class members;

45. Plaintiff and the Class members have suffered injury in fact and have lost money and property as a result of being exposed to Defendants' unfair practices.

46. The above-described unfair business practices conducted by Defendants present a threat and likelihood of harm and deception to members of the Class and the public in that Defendants have systematically perpetrated and continues to perpetrate the unfair conduct upon members of the public by engaging in the conduct described herein.

47. Plaintiff alleges in the alternative that he does not otherwise have an adequate remedy at law. Specifically, there is no adequate remedy at law associated with Defendants' unfair business practices since an injunction is required to prevent future harm to the public. Pursuant to Business and Professions Code sections 17200 and 17203, Plaintiff, on behalf of himself and the Class, seeks an order enjoining Defendant from continuing to engage in unfair business practices along with restitution for the Class.

**SECOND CLAIM FOR RELIEF**

**(Breach of Contract)**

48. At all times there existed uniform Power Purchase Agreement to which Defendants and members of the class were parties. Under the terms of these agreements, Defendants were required to make True Up and Performance Guarantee payments to Class Members.

49. At all times herein mentioned, Defendants breached the contract by intentionally failing to submit True Up and Performance Guarantee payments to members of the Class and enacting policies and procedures that were designed to frustrate Class Members' efforts to obtain performance under the contracts.

50. As a direct and proximate result of Defendants' refusal to make the payments required under the standard Power Purchase Agreements and enacting policies and procedures that were designed to frustrate Class Members' efforts to obtain performance under the contracts, Plaintiff and members of the Class have been damaged in an amount to be proven at trial.

**THIRD CLAIM FOR RELIEF**

**(Negligence)**

51. At all times herein mentioned, Defendants owed a duty to Plaintiff and the Class to use reasonable care with respect to the administration of Power Purchase Agreements there were responsible for administering.

52. Defendants breached this duty by failing to take reasonable steps to ensure that Plaintiff and Class Members received accurate accountings of the amounts they were owed for True-Up and Performance Guarantee payments and by failing to make payments owed under the contracts.

53. As a direct and proximate result of Defendants' breach of their duty, Plaintiff and members of the class have been damaged in an amount to proven at trial.

**FOURTH CLAIM FOR RELIEF**

**(An Accounting)**

54. At all times mentioned herein there existed a special relationship between Defendants and the Class. Specifically, because of the nature of the technology involved in the

PPAs described herein, Class Members must rely on Defendants to provide annual accountings to properly calculate True-Up and Performance Guarantee payments.

55. For most consumers it is extremely difficult if not impossible for them to calculate the amount of the True-Up and Performance Guarantee payments without data and information from Defendants.

56. Based on the foregoing, Plaintiff seeks an order requiring Defendants to provide a complete and accurate accounting of all True-Up and Performance Guarantee Payments that are owed to the Class for the period of 2 years prior to the filing of this complaint through the date of Final Judgment.

## FIFTH CLAIM FOR RELIEF

**(Declaratory Relief, on Behalf of the Declaratory Relief Sub-Class Only)**

57. Section 14.04(e) of the Agreement between Defendants and plaintiff provides that "This Agreement shall terminate upon the occurrence of any one of the following: . . . Either Party is in breach of this Agreement and such breach continues, after notice to the other Party, for a period greater than ninety (90) calendar days."

58. On several occasions in 2022 and 2023 plaintiff advised defendants that he was terminating his agreement pursuant to Section 14.04(e) as a result of their failure to submit True-Up and Performance Guarantee payments within 90 days of being advised that the payments were owed. In response, defendants took the position that the agreement could not be terminated because the non-payment was not a "material breach" of that agreement.

59. There now exist a dispute between the parties as to whether the non-payment of performance guarantee and true-up payments for more than 90 days after being advised of the non-payment constitutes grounds for terminating the PPA.

60. Through this action, Plaintiff seeks a declaration from the Court on behalf of the Declaratory Relief Subclass that any such Class Members who has provided notice to defendants of its non-payment of true-up and performance guarantee payments and for whom such non-payment has not been cured within 90 days has the right, at their option, to terminate their PPA with defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

A. For compensatory damages in an amount to be determined at trial;

B. For an accounting;

C. For an award of reasonable attorneys' fees, costs and expenses;

D. For interest as provided by law, including but not limited to pre-judgment and post-judgment interest as provided by rule or statute; and

E. For such other and further relief, including equitable and injunctive relief, that the Court deems just, equitable, and appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: January 21, 2026.

KERSHAW TALLEY BARLOW, PC

By: */s/ Stuart C. Talley*

Stuart C. Talley
William A. Kershaw
Ian J. Barlow
401 Watt Avenue
Sacramento, California 95864
Telephone: (916) 779-7000
Facsimile: (916) 244-4829
Email: stuart@ktblegal.com
Email: bill@ktblegal.com
Email: ian@ktblegal.com

*Attorneys for Plaintiff and the putative Class*